UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

KEITH LETTLEY,

              Petitioner,

     -against-

JAMES J. WALSH, Superintendent
of Sullivan Correctional Facility,

             Respondent.

------------------------------------------------------x

**REPORT AND RECOMMENDATION**
**01-CV-5812 (NGG)(LB)**

**Bloom, United States Magistrate Judge:**

Keith Lettley petitions this Court *pro se* seeking a writ of habeas corpus pursuant to 28

U.S.C. §2254. The Honorable Nicholas G. Garaufis, United States District Judge, referred this

petition to the undersigned for a Report and Recommendation in accordance with 28 U.S.C.

§636(b). For the reasons set forth below, it is respectfully recommended that the petition should

be denied.

## BACKGROUND

I. Facts

Petitioner was arrested on October 31, 1995 for a robbery committed that same day.

According to testimony adduced at trial, petitioner and two other men broke into the Queens

County home of Paul Sanchez and Jessica Martinez at approximately 10:20 p.m. on October 31,

1995. At gunpoint, they tied up Sanchez and robbed him, Martinez and their two children, ages

fifteen months and eight years old, of jewelry, cash and a microphone. Petitioner was captured

and arrested by the police as he ascended the basement steps of the victims' home. Petitioner

provided a statement to the police admitting that he participated in the robbery with two other

men.

After trial in the Supreme Court, Queens County, the jury found petitioner guilty on all

fifteen counts of the indictment: (1) four counts of Robbery in the First Degree (New York Penal

Law (hereinafter "Penal Law") § 160.15[2],[4]) (counts 1-4); (2) two counts of Robbery in the

Second Degree (Penal Law § 160.10[1]) (counts 5-6); (3) two counts of Burglary in the First

Degree (Penal Law § 140.30) (counts 7-8); (4) one count of Criminal Possession of a Weapon in

the Second Degree (Penal Law § 265.03) (count 9); (5) one count of Criminal Possession of a

Weapon in the Third Degree (Penal Law § 265.02[4]) (count 10); (6) two counts of Unlawful

Imprisonment in the First Degree (Penal Law § 135.10) (counts 11-12) ; (7) two counts of

Endangering the Welfare of a Child ("Penal Law § 260.10[1]) (counts 13-14), and (8) one count

of Criminal Possession of Stolen Property in the Fifth Degree (Penal Law § 165.40) (count 15).

(Tr. 2172-75).

Petitioner was sentenced on August 14, 1997 as a second felony offender to determinate

terms of imprisonment of twenty-five years on the convictions for counts one to four; fifteen

years for counts five and six, twenty-five years for counts seven and eight; fifteen years for count

nine, seven years for count ten, one year for counts thirteen and fourteen; and one year for count

fifteen. The sentences imposed for convictions on counts one, three, five, seven, nine, ten and

eleven, were to run concurrently; while the sentences imposed for counts two, four, six, eight and

twelve were to run concurrently with one another, but consecutively to the sentence imposed

under count one. The remaining counts, thirteen, fourteen and fifteen, merged with the

2

indeterminate sentences for counts eleven and twelve. Petitioner is currently incarcerated serving that sentence.

## II. Procedural History

### A. Direct Appeal

On direct appeal, appointed appellate counsel, Michael O'Brien, Esq., filed a brief in July 1999 on petitioner's behalf and petitioner filed a supplemental *pro se* brief. Appellate counsel argued that (1) petitioner's speedy trial motion had been improperly denied; (2) the trial court erred in denying petitioner's Batson v. Kentucky, 476 U.S. 79, 97-98 (1986) challenges to the prosecution's alleged discrimination against minority jurors and in granting the prosecutor's Batson challenge of a juror; and, (3) petitioner's sentence was erroneous.[1] Petitioner's supplemental *pro se* brief raised five grounds: (1) the trial court erred in failing to dismiss or disqualify a juror who informed the court that he was "intimidated" by persons in the courtroom and who had ignored the court's admonition not to speak to other jurors; (2) the state failed to meet its burden at the Wade hearing; (3) petitioner was arrested without probable cause because the police had no description of the suspect and had no reason to believe he was involved in criminal conduct; (4) the court erred in questioning a juror regarding bias in petitioner and his

---

[1] Petitioner filed other motions in state court during the pendency of his appeal. In September 1999, petitioner filed a *pro se* motion to vacate raising two grounds: that (1) the prosecution improperly withheld People v. Rosario, 9 N.Y.2d 286, 213 N.Y.S.2d 448 (1962) material, specifically a "911" tape; and (2) counsel failed to discuss the tape with petitioner. On January 24, 2000, the motion was denied. On September 28, 1999, appellate counsel filed a motion seeking a reconstruction hearing regarding petitioner's speedy trial claim which was denied. On February 25, 2000, petitioner filed a motion in the Appellate Division seeking a reconstruction hearing which was denied by Order dated March 28, 2000. Petitioner does not raise the speedy trial claim or the Rosario claim in the instant petition.

trial counsel's absence; (5) the prosecutor's summation denied defendant Due Process and a fair trial.

The New York Supreme Court Appellate Division, Second Department, found "the trial court properly determined that the explanation proffered by the defense counsel for the exercise of his peremptory challenge against a prospective juror was mere pretext offered in an attempt to conceal an intention to discriminate based on race. This determination is entitled to great deference on appeal and will not be disturbed where, as here, it is supported by the record." People v. Lettley, 275 A.D.2d 799, 714 N.Y.S. 2d 225 (2d Dep't 2000). The appellate court also found that "defendant's sentence was not illegal" and "defendant's remaining contentions, including those raised in his supplemental *pro se* brief, are without merit." Id. Appellate counsel filed a request for leave with the New York Court of Appeals on October 18, 2000 and petitioner filed a supplemental *pro se* request a week later, on October 25, 2000. The New York Court of Appeals denied petitioner leave to appeal on December 20, 2000. People v. Lettley, 95 N.Y.2d 966, 722 N.Y.S.2d 483 (2000).

B. The Instant Habeas Petition

Lettley filed the instant *pro se* petition seeking a writ of habeas corpus under 28 U.S.C. §2254 in the United States District Court for the Southern District of New York. By Order dated August 2, 2001, it was transferred to this Court. Petitioner asserts three claims: (1) his right to a fair trial was violated when the trial court empaneled a prospective juror despite his trial counsel's attempt to exercise a peremptory challenge, as well as when the court upheld the prosecutor's use of peremptory challenges against a Batson challenge; (2) his right to a fair trial was violated when the trial court failed to disqualify a juror who during the trial expressed

4

concern about four individuals whom he had seen enter the courtroom; and (3) he was denied his right to be present during his criminal proceeding when, after the jury had rendered its verdict, the trial court judge met with the members of the jury outside the presence of the defendant and his trial counsel. Petition, Attachment p. 1-8.

C. Motions to Amend

On June 26, 2002 petitioner filed a motion to amend his petition which I denied by Report and Recommendation ("R & R") dated March 7, 2003. The Honorable Nicholas G. Garaufis adopted my R & R on April 11, 2003, and petitioner appealed. Petitioner's interlocutory appeal was dismissed by the United States Court of Appeals for the Second Circuit by Mandate issued November 10, 2003.

Petitioner moved by letter dated November 23, 2004 for leave to amend his habeas petition to add a claim that his trial counsel provided ineffective assistance in the form of "erroneous and inaccurate advice concerning the calculation of the petiti[o]ner's maximum possible sentencing exposure upon a conviction." Nov. 23, 2004 Ltr. (Docket Entry # 49) at 4. By Order dated September 16, 2005, petitioner's motion was denied on the ground that the proposed amendment would be futile.

# DISCUSSION

I. Standard of Review

Petitioner's claims that were decided on the merits are governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2254. The statute provides that:

5

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any
claim that was adjudicated on the merits in State court proceeding unless the
adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the state court proceeding.

28 U.S.C. §2254(d).

The Supreme Court has held that a state court decision is "contrary to" a clearly

established Federal law if a state court either "arrives at a conclusion opposite to that reached by

[the Supreme Court] on a question of law," or a state court decides a case differently than the

Supreme Court has on a set of "materially indistinguishable facts." Williams v. Taylor, 529 U.S.

362, 405-406 (2000). The Williams Court further held that the "unreasonable application" clause

is triggered if a state court "identifies the correct governing legal principle from [Supreme Court]

decisions but unreasonably applies it to the facts of the particular state prisoner's case." Id. at

407. But the Supreme Court also noted that "an *unreasonable application* of federal law is

different from an *incorrect* application of federal law." Id. at 410 (emphasis in original).

Therefore, "a federal habeas court may not issue the writ simply because that court concludes in

its independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411;

accord Bell v. Cone, 535 U.S. 685, 694 (2002). As this standard has been interpreted by the

Second Circuit in Francis v. Stone, "[s]ome increment of incorrectness beyond error is required .

. . the increment need not be great; otherwise, habeas relief would be limited to state court

6

decisions 'so far off the mark as to suggest judicial incompetence.'" 221 F.3d 100, 111 (2d Cir.

2000) (quoting Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 889 (3d Cir. 1999)).


II. Exhaustion

Petitioner exhausted his state court remedies for the three claims raised herein. These

claims have also been adjudicated on the merits. A state court "adjudicates" a claim "on the

merits" when "it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to

judgment." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). Claims that have been

adjudicated "on the merits" are given deference under the AEDPA, whereby "the state court need

only dispose of the petitioner's federal claim on substantive grounds, and reduce that disposition

to judgment. No further articulation of its rationale or elucidation of its reasoning process is

required." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001). The AEDPA deferential standard

of review is triggered even where the claim is dismissed by the state court with the blanket

phrase, "[d]efendant's remaining contentions are without merit.'" Ryan v. Miller, 303 F.3d 231,

246 (2d Cir. 2002).

Here, the Appellate Division's opinion does not specifically address petitioner's Sixth

Amendment claim, the Court's ruling on the prosecutor's Batson challenge, or petitioner's claim

regarding a biased juror. The Appellate Division's decision does however state that "defendant's

remaining contentions, including those raised in his supplemental *pro se* brief, are without

merit." People v. Lettley, 275 A.D. 2d 799. Therefore, this Court may not grant habeas relief on

these claims "unless the adjudication of the claim resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

7

Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Aparicio v. Artuz</u>, 269 F.3d at 92-93.


III. <u>Right to a Fair Trial</u>

 Petitioner's first claim is that he was denied a fair trial when the court failed to disqualify a juror who expressed concern about four individuals who entered the courtroom during the trial.

 A. <u>Background</u>

 Petitioner argues that it was error for the trial court to retain a juror who expressed concern about four individuals, later identified as petitioner's two brothers, cousin and friend, who entered the courtroom during the trial. Out of the presence of other jurors, the juror expressed concern to a court officer who in turn reported the juror's concern to the trial judge. (Tr. 1581). Following the court's instructions, the court officer, outside the presence of the other jurors, instructed the juror not to speak about his concern with any other jurors. (Tr. 1581). The trial court discussed the matter with the parties. (Tr. 1581-1582). Petitioner's motion for a mistrial was denied as premature. (Tr. 1582-83). Petitioner noted on the record that while these four individuals were African-American, other people entering and leaving the courtroom were not. (Tr. 1583). The trial court noted for the record that the concerned juror was also African-American. <u>Id.</u>

 The trial judge discussed the matter with the juror, out of the presence of the other jurors, but in the presence of petitioner, his attorney and the prosecutor in order to determine the juror's "fitness to continue to serve on the panel." (Tr. 1585). With petitioner's consent, the four

individuals were asked to step outside while the trial court spoke with the juror about his concerns. (Tr. 1586-87).

During this discussion, the trial court ascertained that this juror had been unaware that the courtroom was an "open" forum and that citizens were free to come and go. The trial court thoroughly queried the juror if it was these particular individuals that he found "intimidating" or the fact that any individuals could come and go. (Tr. 1589-1605; 1608-11). The juror assured the trial court that his trepidation was not specific to these individuals, rather that he had not known that the courtroom was an open forum. Once the juror assured the court that he would be able to be a fair and impartial juror and that the presence of the spectators would not affect his ability to discharge his responsibilities as a juror, he returned to the jury for the remainder of the trial. (Tr. 1604-1617). Petitioner's renewed motion for a mistrial was denied. (Tr. 1617-1622).

When the trial resumed, the trial court informed all the jurors that the proceedings were open to the public. The Court reminded the jurors not to discuss the case and directed them to raise any question or issue to the court officer, not to fellow jurors. (Tr. 1622-25).

B. Analysis of Juror Partiality Claim

Under the Sixth Amendment, a criminal defendant has the right to a trial by an impartial jury. Reynolds v. United States, 98 U.S. 145, 154 (1879). That right is compromised when the trier of fact is unable to render a disinterested, objective judgment. The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." Smith v. Phillips, 455 U.S. 209, 215 (1982); accord Remmer v. United States, 347 U.S. 227, 229-30 (1954) ("The trial court ... should determine the

circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.").

The handling of possible juror partiality or misconduct "is entrusted to the sound discretion of the trial court." Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 813 (2d Cir. 2000) (quoting United States v. Thai, 29 F.3d 785, 803 (2d Cir. 1994)). "On § 2254 review, the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial." Id. "[T]he Supreme Court has made it clear that the 'trial court's findings of impartiality [may] be overturned only for manifest error.'" Id. (quoting Knapp v. Leonardo, 46 F.3d 170, 176 (2d Cir.1995) (alteration in original)). There must be "fair support in the record for the state court['s] conclusion that the jurors here would be impartial." Patton v. Yount, 467 U.S. 1025, 1038 (1984).

Here, the juror who expressed concern about four individuals who entered the courtroom was questioned in open court in the parties' presence and repeatedly assured the Court of his ability to serve as a fair and impartial juror. In an abundance of caution, the Court gave a clarifying instruction to the entire jury. (Tr. 1588-1617). Petitioner contends that the trial court should have granted his motion for a mistrial. However, the state court's decision allowing the juror to remain and denying a mistrial was not contrary to or an unreasonable application of clearly established Federal law. See Smith v. Phillips, 455 U.S. at 215. Thus, petitioner's claim that the Court should have disqualified the juror or declared a mistrial should be denied.

## C. Claim of Juror Bias Post-Verdict

Petitioner briefly references an ancillary claim of juror bias at his trial. Petition, Attachment at p. 7. He states that in the final moments of the trial court's discussion with the

jury before its dismissal, after the verdict and his assault on the prosecutor (discussed in section IV below), the trial court learned that other jurors may have "thought someone had followed [them] but no one brought that to my attention." (Tr. 2190). The trial court dismissed this brief mention of juror bias, stating "I'm not going to get into that now other than to say that I do not believe you have anything to be concerned about." Id.

Liberally construed, petitioner has exhausted this claim by raising it in his *pro se* supplemental brief to the Appellate Division, Pro Se Supplemental Brief at 11, and the state court adjudicated it on the merits when it stated in its decision: "defendant's remaining contentions, including those raised in his supplemental *pro se* brief, are without merit." People v. Lettley, 275 A.D. 2d 799.

The claim, however, is without merit. A trial court is required to hold a post-trial interrogation of a juror only when reasonable grounds for investigation exist. United States v. Moten, 582 F.2d 654, 666-67 (2d Cir. 1978). Reasonable grounds are present when there is "clear," "strong" and "incontrovertible" evidence of bias, misconduct or extraneous influences. King v. United States, 576 F.2d 432, 438 (2d Cir.1978) (quoting United States v. Dioguardi, 492 F.2d 70, 78, 79, 80 (2d. Cir.1974)). No reasonable grounds were present for the trial court to hold a post-trial juror interrogation herein. Since the state court's decision on this claim was not contrary to or an unreasonable application of clearly established Federal law, petitioner's claim regarding alleged juror bias revealed post-verdict should be denied.

11

IV. Sixth Amendment Claim: Right to Be Present at Trial

A. Background

Petitioner's second claim arises from a brief but dramatic moment at the trial, after the jury had rendered its verdict and been polled by the Court, but before the Court dismissed the jury. (Tr. 2180-85). Petitioner sprang from his chair and lunged at the prosecutor. (Tr. 2180). Although petitioner made brief contact with the prosecutor's arm, he was immediately wrestled to the ground by eight court officers and promptly handcuffed and escorted from the courtroom. (Tr. 2180-81). The jury was excused with the promise of a more formal sendoff from the judge before their dismissal from service. (Tr. 2180). The Court then held a brief dialogue with defense counsel, the prosecutor and court officer, Sergeant Markowitz. (Tr. 2181-85; 2187). The trial judge stated on the record that in all her years of experience, she had never witnessed such behavior, found it upsetting and presumed that it must also be upsetting for the jury. (Tr. 2184). She added that she was initially concerned that petitioner was "looking to attack" the jury but apparently "was after" the prosecutor. (Tr. 2183). The prosecutor said that although petitioner had reached him, he did not believe he was harmed (he sought emergency medical treatment after the jury was excused). (Tr. 2182).

Defense counsel said she was stunned, but had not really witnessed the event because the court officers had petitioner on the ground before she comprehended what had happened. Id. Thereafter, the court had a brief dialogue with the jury, assuring them that while the incident was disturbing, it was an aberration, that they were never in danger, there was no reason to worry and that they each would be driven home. (Tr. 2187-94).

12

B. Petitioner's Removal from the Courtroom

Petitioner argues herein that his absence from the courtroom (because he had been escorted out of the courtroom by court officers after he lunged at the prosecutor) during the judge's colloquy with the jury violated his right under the Sixth Amendment Confrontation Clause.

A criminal defendant has the right under the Sixth Amendment to be present at all critical stages of his prosecution. Rushen v. Spain, 464 U.S. 114, 117 (1983). Nonetheless, if a defendant misbehaves at trial to such an extent that his conduct is unduly disruptive, the trial judge has the power to remove him from the courtroom and to continue the trial in his absence until he promises to behave properly. The defendant who misbehaves in the courtroom waives his right to be present at trial. See Illinois v. Allen, 397 U.S. 337, 343 (1970) ("a defendant can lose his right to be present at trial").

In Allen, the Supreme Court held that there are at least three constitutionally permissible ways to handle an obstreperous and contumacious defendant: to keep him present, bound and gagged if necessary; to cite him for contempt; or to remove him from the courtroom until such time as he evinces a willingness to conduct himself properly. Id. The choice is within the discretion of the trial court: "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." Id.

The question of whether a warning is constitutionally required before a defendant is removed from the courtroom has not yet been decided by the Supreme Court. The Second Circuit has held, albeit after the state court decisions in the instant case, that "even absent a

13

warning, a defendant may be found to have forfeited certain trial-related constitutional rights based on certain types of misconduct." Gilchrest v. O'Keefe, 260 F.3d 87, 97 (2d Cir. 2001); see also, Norde v. Keane, 294 F.3d 401 (2d Cir. 2002) (removal of defendant from courtroom during voir dire due to his disruptive behavior was within trial court's broad discretion).

Moreover, New York courts have consistently held that disruptive defendants may be held to have, in effect, waived their right to be present during trial, People v. Jackson, 16 A.D.3d 156 (1st Dep't 2005); People v. Myers, 215 A.D. 2d 595 (2d Dep't 1995). Especially instructive is a remarkably similar case recently decided by the Appellate Division, in which the defendant was removed from the courtroom without warning, People v. Wilkens, 33 A.D. 3d 409 (1st Dep't 2006). In Wilkens, after the "foreperson announced the jury's guilty verdict as to the first two counts of the indictment, defendant suddenly charged the prosecutor, in close proximity to the jurors. Defendant had to be restrained by numerous court officers, some of whom were injured in the violent struggle." After defendant was removed, the court accepted the remainder of the jury's verdict in his absence. The Appellate Division held that even absent a warning, certain types of misconduct may lead to the forfeiture of "certain trial-related constitutional rights." Id. (citing Gilchrest, 260 F.3d at 97 and Franco v. Costello, 322 F. Supp. 2d 474, 477 (S.D.N.Y. 2004)).

Significantly, the Appellate Division distinguished a defendant's sudden violent behavior from disruptive behavior during trial:

> Here, defendant's behavior in the courtroom went far beyond mere disruption, and created an emergency necessitating his immediate removal. Under the circumstances, the court had no practical opportunity to issue a verbal warning that defendant would be removed if he continued to engage in such conduct, and it appears that such a warning would have served no purpose. . . . [W]here the

> nature of a defendant's disruption consists of violence toward another person, we are reluctant to hold that the defendant must first be warned before being removed. . . . We conclude that the court had no practical alternative except to remove defendant immediately and take the remainder of the verdict without him.

Id. (internal citations and quotations omitted).

Similarly, in the instant case, the court had no practical opportunity to warn petitioner that his conduct would result in removal as petitioner did not misbehave during trial. At the very end of the proceedings, however, he lunged at the prosecutor requiring eight court officers to restrain him. His violence warranted his immediate removal from the courtroom, without warning. Here, petitioner's sudden violence after the verdict is easily distinguished from the contumacious or obstreperous defendants in the cases applying Allen, see e.g., L'Abbe v. DiPaolo, 311 F.3d 93, 99 (1st Cir. 2002); United States v. Stewart, 20 F.3d 911, 915 (8th Cir. 1994); United States v. Hemsi, 901 F.2d 293 (2d Cir. 1990); Saccomanno v. Scully, 758 F.2d 62 (2d Cir. 1985); United States v. Solomon, No. 95 CR 154, 1997 WL 232523, at * 3-4 (S.D.N.Y. May 8, 1997). Moreover, the court had already polled the jury and accepted the verdict, so petitioner's absence was of little consequence. Petitioner was only absent for the brief colloquy. No motions were made or decided. Accordingly, the state court's decision that denied petitioner's Sixth Amendment claim regarding his absence from the courtroom was not contrary to or an unreasonable application of clearly established Federal law. Therefore, the claim should be denied.

15

V. Batson Claims

    A. Procedural Background

    Petitioner raised two Batson claims on appeal: the trial court erred when it determined

that: (1) Ms. Geis was struck for a discriminatory reason and seated her on the jury; and (2) the

prosecution's peremptory challenges to four jurors were not exercised in a discriminatory

manner.[2] The Appellate Division ruled on the merits of petitioner's Batson claim for purposes

of the AEDPA. The New York Court of Appeals denied leave to appeal. Petitioner raises these

two Batson issues herein.

    B. The Batson Standard

    Batson v. Kentucky, 476 U.S. 79 (1986), and its progeny forbids discrimination in jury

selection by limiting the traditionally unfettered exercise of peremptory strikes. The Supreme

Court has generally granted individual courts the leeway to adopt their own procedures to test for

discriminatory strikes. See Howard v. Senkowski, 986 F.2d 24, 29 (2d Cir. 1993) ("[T]he

decisions ... recognize the role that remains for lower courts to work out the mechanics for

implementing these requirements."). Batson established a three step burden-shifting framework

to be used by trial courts to assess whether a peremptory strike is based on an impermissible

discriminatory motive in violation of the Equal Protection Clause of the Fourteenth Amendment.

---

[2]Respondent argues that petitioner failed to exhaust the Batson claim as to two of the four
jurors struck by the prosecution in the fourth round of jury selection. Since petitioner mentions
all four jurors in his state court appellate brief, see Brief for Defendant-Appellant at 11, 23, 24,
and the appellate court did not specifically address petitioner's Batson challenge to four jurors
but rather stated that "defendant's remaining contentions" are "without merit," petitioner's
Batson claim is addressed in its entirety.

First, the trial court must determine whether the party challenging the other party's proposed peremptory strike made a *prima facie* showing that the proposed peremptory strike is based on race. Rice v. Collins, 546 U.S. 333, 337 (2006) (citing Batson, 476 U.S. at 96-98). Second, if such a showing is made, the burden shifts to the nonmoving party to present a race-neutral reason for striking the juror in question. Id. The nonmoving party's burden at step two is very low. Although a race-neutral reason must be given, it need not be "persuasive, or even plausible;" Batson 476 U.S. at 97, so long as the reason is not inherently discriminatory, it will suffice. Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (*per curiam*). Finally, the trial court must determine whether the moving party carried its burden of proving by a preponderance of the evidence purposeful discrimination. Rice, 546 U.S. at 338, citing Batson, 476 U.S. at 98 and Miller-El v. Dretke, 545 U.S. 231, 252 (2005)). This third step "requires a trial judge to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." Jordan v. Lefevre, 206 F.3d 196, 200 (2d Cir. 2000) (internal quotation marks omitted), but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, 514 U.S. at 768; see also McKinney v. Artuz, 326 F.3d 87, 98 (2d Cir. 2003) (throughout the Batson procedure, it is the movant's burden to prove that a strike was exercised on an impermissible discriminatory ground)(internal citations omitted). "[T]he decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." Id. (quoting Hernandez v. New York, 500 U.S. 352, 365 (1991)).

17

C.  Standard of Review of the Trial Court's Decision

"Because a trial court's determination of whether a juror was struck for a discriminatory reason turns largely on the judge's observations of the attorneys and prospective jurors and an evaluation of their credibility, 'a reviewing court ordinarily should give those findings great deference.'" Galarza v. Keane, 252 F.3d 630, 635 (2d Cir. 2001) (quoting Hernandez, 500 U.S. at 364). "More particularly, when reviewing a Batson challenge in the context of a habeas petition, a trial court's conclusion that a peremptory challenge was not exercised in a discriminatory manner is entitled to a presumption of correctness, except, *inter alia*, to the extent that the trial court did not resolve the factual issues involved in the challenge or if the finding is not fairly supported by the record." Id.

D.  Jury Selection in Petitioner's Case

Petitioner's jury was selected according to the jury box system, in which groups of prospective jurors are randomly called from the venire, interviewed and then challenged by the attorneys.  Following decision on the challenges for cause, the lawyers are afforded the opportunity to exercise one or more of their twenty peremptory challenges. A new set of potential jurors is then invited into the jury box, and the process is repeated until a jury is empaneled. See generally People v. Webb, 187 Misc.2d 451, 722 N.Y.S.2d 349, 350-51 (N.Y.Sup.Ct. 2001).

Jury selection in this case took five days (Tuesday, Wednesday and Thursday of the first week and Monday and Tuesday of the following week) and there was an expressed concern about the availability of potential jurors. (Tr. 870-872; 1080-1083).  Not only was there "less availability of jurors in general at this time in July," (Tr. 1352), but a judicial seminar was scheduled to occur during petitioner's trial, so the court had summoned a smaller number of

18

jurors than normal and would not be summoning more jurors until the following week. (Tr. 1152-53; 1351-52).

The first three rounds of jury selection occurred on July 8, 9 and 10, 1997; petitioner alleges no errors within these rounds. The fourth round, conducted on July 10, 14 and 15, 1997, involved questioning the last set of potential jurors of the first venire and then a second venire of twenty jurors, the last available jurors. (Tr. 870: "I will send for whatever is left downstairs;" 881) Petitioner's two Batson claims arise from this fourth round of jury selection.

At the end of the day on Thursday, July 10, 1997, the trial court asked both sides whether they would reconsider their peremptory challenges in order to complete a jury of twelve because no other panels of potential jurors were available. (Tr. 1152-53). Both sides declined. (Tr. 1352).[3] On Monday afternoon, July 14, 1997, the trial court heard the parties' Batson challenges. (Tr. 1084-1153). On Tuesday, July 15, 1997, the trial court noted that only eleven jurors had been selected. The Court then ruled on the parties Batson challenges. The trial court denied petitioner's challenge to the prosecution's peremptory challenges of four African-American jurors and the four potential jurors were excused. The trial court upheld the prosecutor's Batson challenge to the petitioner's proposed peremptory strike of the white woman Geis and seated her, over petitioner's objection. This completed the jury's selection. The trial court, citing her discretion, decided to proceed to trial without an alternate juror. (Tr. 1383).

---

[3]Because of a page-numbering error, the trial transcript skips pages 1153 to 1349. In addition, page 1350, the cover page for the July 15, 1997 proceedings, is missing from the state record. Therefore, pages 1153 and 1351 are actually sequential, but reflect proceedings on different days  That is, page 1153 is the last page of the proceedings on July 14, 1997 and page 1351 is the first page of the proceedings on the next day, July 15, 1997.

19

### E. The State's Batson Challenges

On Thursday July 10, 1997, after petitioner proposed a peremptory strike to a Caucasian woman, Ellen Geis ("Geis"), the prosecutor objected that the strike was made because of Geis's race. (Tr. 1089-90. 1093).[4] Petitioner stated the basis for his objection to Geis was that she was the victim of a crime. The prosecutor argued that petitioner had not challenged an earlier African-American woman juror, Ms. Hook, although she, like Geis, was a school teacher and a victim of a crime. (Tr. 1090). In fact, the state argued, Ms. Hook was the victim of a robbery at gunpoint inside a building, a crime more similar to the crime for which petitioner stood accused. The state argued that petitioner had exercised a pattern of discrimination against Caucasian jurors[5] and the only difference between Hook and Geis was their race. (Tr. 1090-91).

Petitioner argued that the state had not met its burden of a *prima facie* showing of discrimination and that he had exercised his peremptory strike in a race-neutral manner. (Tr. 1093-95). Petitioner stated that the reason for striking Geis was that, although Geis stated that she could not identify the perpetrator who robbed her, she believed that he was an African-American man, an observation that, petitioner argued, showed "some type of racial mind set." (Tr. 1100). Petitioner also proffered that, as a school teacher, Geis may "align" herself with the

---

[4]While the prosecutor objected to the striking of another juror, Asak Torres, at the same time on the basis of race, the trial court upheld petitioner's peremptory challenge to Torres and excused him from the venire. (Tr. 1382-83). The challenge to Mr. Torres is not at issue herein.

[5]The trial court did not rely on this argument in finding petitioner's argument pretextual and in fact barely addresses this portion of the state's argument. (Tr. 1091-92). Petitioner estimated that in the original venire of 115 persons, only ten to fifteen were African-American. Petitioner objected at the beginning of voir dire that the pool itself was discriminatory; the trial court denied his challenge to the venire. (Tr. 101-106) The prosecution cited to a number of Caucasian jurors who were struck, but did not proffer statistical evidence.

victim children in this case. (Tr. 1100-01). Over the course of the Batson argument, petitioner added that Hook was a victim twenty years ago whereas Geis was a crime victim six years ago. (Tr. 1151).

### F. Petitioner's Batson Challenges

Petitioner objected to the prosecution's peremptory challenges directed against Danielle Brooks ("Brooks"), Vincent Garrett ("Garrett"),[6] Darlene Phillips ("Phillips"), Alfred Barnes ("Barnes"), and Clarence King ("King"), all of whom were African-American, arguing that the state exercised its peremptory challenges on the basis of race. (Tr. 1110). As to Barnes, Brooks and King, petitioner argued that the prosecution had not challenged Daniel Rabrizzan ("Rabrizzan") in round two despite the fact that he, like Barnes and King, had been previously arrested. As to Phillips, petitioner argued that the prosecution had not challenged Rabrizzan and Hooks in earlier rounds despite the fact that they, like Phillips, have family members who are police officers. (Tr. 1116-17).

### G. The Batson Analysis

#### 1. Juror Geis

The prosecution challenged petitioner's peremptory challenge of Geis, saying it was based on race. Georgia v. McCollum, 505 U.S. 42, 59 (1992) (extending Batson to peremptory challenges made by criminal defendants).[7] The trial court applied the three-step Batson analysis

---

[6] Since the instant petition does not raise the decision to strike Garrett from the panel, Garrett is not discussed herein

[7] People v. Kern, 75 N.Y. 2d 638, 555 N.Y.S.2d 647, cert. denied, 498 U.S. 824 (1990) is the New York state equivalent of McCollum. Thus, the trial court consistently referred to the prosecution's challenge to petitioner's attempted peremptory strike of a Caucasian juror as a "Kern" challenge, while referring to petitioner's challenge to the prosecution's attempted

and held that petitioner's peremptory challenge to Geis was race-based. First, the court found that the prosecution had made a *prima facie* case (Tr. 1095). The court then asked petitioner to provide a race-neutral reason for his exercise of the peremptory strike. Petitioner provided several explanations for the peremptory challenges over the next two days: Geis had presumed that her attacker was African-American even though she had not seen him; she was a school teacher of young children who may be biased in favor of the children victims; and she was a victim of a crime more recently than juror Hook.

The third step of the <u>Batson</u> inquiry requires the trial court to evaluate the proffered justification for the peremptory challenge. Here, the trial court repeatedly questioned petitioner's counsel and explored the record for evidence of the race-neutral explanation for the challenged peremptory strike of Geis. (Tr. 1372-78). The trial court noted that Geis was a junior high school teacher who taught seventh and eighth grade students, not young children like the ones in this case, ages eighteen months and six years old. (Tr. 1042, 1101). To resolve whether

---

peremptory strike of four African-American jurors as a <u>Batson</u> challenge. As the procedure to test the constitutionality of a peremptory strike is the same, this Court refers to both the petitioner and the prosecution's challenges as <u>Batson</u> challenges.

Geis had seen her robbers like Hook (Tr. 1102: "two male blacks with guns") or was merely

speculating as to their race, the Court had Geis's responses read back.[8] (Tr. 956-9; 1144-

---

[8]The relevant portion of the transcript reads:

The Court:  All right.  And how many persons mugged you?
Prospective Juror : One
The Court: Did you see the person?
Juror: No
The Court: Do you know down [sic][now?] if it was a male?
Prospective Juror: Male.
The Court: Do you know if it was a white person or a black person, an Asian person
or an Indian person?
Prospective Juror: Black male.
The Court: So you did get somewhat of a look at him.  You know it was a man, you
know it was a black man.  Do you know if it was a young man or an older man?
Prospective Juror: No.
The Court: No. Okay.  Would the fact that it was a black person cause you to hold
it against the defendan[t] in this case?
Prospective Juror: No.
The Court: All right.  Was anything taken from you?
Prospective Juror: Yes.
The Court: What?
Prospective Juror: A wallet and an address book from my office.
The Court. Okay. Now, then the person ran away?
Prospective Juror: Yes.
The Court: Did you report that to the police.
Prospective Juror: Yes.
The Court: What happened?
Prospective Juror: Nothing.
The Court: Were you - -
Prospective Juror: It was not in New York City.
The Court: It was not in New York City?
Prospective Juror: It was not in New York City.
The Court.  Okay.  But did nothing happen because [you] were unable to provide a
description?
Prospective Juror: Yes.
The Court. Okay.  Did the police treat you respectfully?
Prospective Juror: Relatively.
The Court. Relatively.  What do you mean?
Prospective Juror: I thought they were a little cond[esc]en[d]ing.
The Court: Cond[esc]ending.  Okay.  Would that cause you to hold that against the police

23

45).

The trial court found that while Geis initially said she could not identify her attacker, she

was able to say he was male, and when offered choices regarding "ethnic group," Geis stated he

was African-American. (Tr. 957; 1145). And while Geis did not state on the record that she was

able to *see* her attacker, such a conclusion was "implicit" in the record and consistent with the

trial court's "recollection of that whole dialogue." (Tr. 1146-48). The trial court further found

that Geis did not, like an earlier prospective juror who stated that she was blindfolded during her

attack, state that she thought he was African-American even though she could not see him. (Tr.

1146-47). The trial court stated: "So as far as I am concerned this juror did not say anything that

would lead me to believe that she based [her description of the perpetrator] upon racial reasons

or assumed anything about the perpetrator. Whatever she said about the perpetrator was based

upon her observations." (Tr. 1147). The trial court added that, on the read back, it was

reminded that Geis proffered what may be a position favorable to the defense *i.e.*, although she

stated that she could be impartial, she felt that the police were condescending to her after she was

the victim of a crime. (Tr. 1049; 1149-50). The trial court reserved final decision, but noted on

the record that petitioner's race-neutral reason for challenging Geis did not "stand up." (Tr.

---

officers who come in and testify here?
Prospective Juror: No
The Court: Was there anything about that experience emotionally as you remember it now
that would affect you as a juror on a criminal case?
Prospective Juror: I don't think so.
The Court: Okay. You're sure about that.
Prospective Juror: Yes.
The Court: Yes. Okay.
(Tr. 957-959)

1150). The following day, the trial court, in a lengthy ruling, held that petitioner's reasons for striking Ms. Geis were a pretext and that the "true reason . . . was based on racial concerns" and seated Geis over petitioner's objection. (Tr. 1365-1382). Therefore, petitioner's challenge was overruled and Geis was seated as a juror. The court's finding is supported by the record. See Miller-El 545 U.S. at 252 ("A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.").

   2. Barnes, King, Brooks, and Phillips

   The trial court also applied the three-step Batson analysis to petitioner's objection to the prosecution's peremptory challenges to four African-American jurors in round four, finding petitioner had made a *prima facie* case as to each of the four challenges. (Tr. 1356,1358). The court solicited the prosecutor's reasons for the exercise of the proposed peremptory challenges. For Barnes, the prosecutor posited that Barnes may sympathize with petitioner because he too was young and foolish at the time at the time of his offenses and that Barnes's sentiment against the police was distinguishable from that held by juror Rabrizzan. (Tr. 1359) As to King, the prosecutor stated that his race-neutral reason for striking him was that since King was indicted on conspiracy charges in the country from which he emigrated and was acquitted, he may sympathize with petitioner. He also stated that King appeared intoxicated. (Tr. 1128;1360). As to Brooks, the prosecutor stated that her brother was arrested by the Queens County District Attorney's office, the same office involved in the instant prosecution. (Tr. 1126;1361). As to

25

Philips, the prosecution argued that her brother was arrested and did jail time. The trial court found that the prosecutor had provided race-neutral reasons for its challenges under <u>Batson</u>.

The trial court then analyzed the credibility of the race-neutral explanations for each of the challenged peremptory strikes, and ruled that the prosecution's exercise of peremptory challenges to these four jurors was not discriminatory. The trial court explicitly credited the prosecutor's race neutral explanation for striking these four jurors and stated: "I don't feel the burden was met by the defense that these were merely pretenses advanced for the purpose of covering up nonracial reasons." (Tr. 1362). Thus, petitioner's <u>Batson</u> challenges to the prosecutor's peremptory strikes were overruled and these four jurors were excused.

The state court's decision was not contrary to or an unreasonable application of Federal law and therefore petitioner's <u>Batson</u> claims should be denied.

## CONCLUSION

Accordingly, it is recommended that petitioner's application for a writ of habeas corpus under 28 U.S.C. §2254 should be denied. Because petitioner has not made a substantial showing of the denial of any constitutional right, no certificate of appealability should issue. 28 U.S.C. §2253(c)(2); <u>Lucidore v. New York State Div. of Parole</u>, 209 F.3d 107, 111-13 (2d Cir. 2000) (upholding issue of a certificate of appealability upon finding of a substantial showing that a constitutional right had been denied). It is also recommended that the Court should certify pursuant to 28 U.S.C. § 1915(a) that *in forma pauperis* status should be denied for the purpose of any appeal. <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

26

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of the receipt of this Report. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72. Any request for an extension of time to file objections must be made within the ten (10) day period. Failure to file a timely objection to this Report generally waives any further judicial review. DeLeon v. Strack, 234 F.3d 82, 86 (2d Cir. 2000); Spence v. Superintendent Great Meadow Corr. Facility, 219 F.3d 162, 174 (2d Cir. 2000); see generally Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

/S/

LOIS BLOOM
United States Magistrate Judge

Dated: December 20, 2007
      Brooklyn, New York